UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NEXIS RENE GOMEZ,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>D. BRAUN, et al.,<br><br>　　　　Defendants. | No. 2:15-cv-2523 KJN P<br><br>ORDER AND FINDINGS &<br>RECOMMENDATIONS |

I. Introduction

　　　Plaintiff is a state prisoner, proceeding pro se and in forma pauperis, in this civil rights action filed pursuant to 42 U.S.C. § 1983. In his amended complaint, plaintiff contends that defendants Dr. Braun and Dr. Majumdar were deliberately indifferent to his serious mental health needs, and delayed mental health care for the same, in violation of the Eighth Amendment, resulting in plaintiff's suicide attempt. (ECF No. 10.) Pending before the court is defendants' motion for summary judgment. As discussed below, the undersigned recommends that the motion be granted.

II. Undisputed Facts[1] ("UDF")

　　　1. Dr. Braun earned a Bachelor of Science degree from Oral Roberts University in

---
[1] For purposes of summary judgment, the undersigned finds these facts are undisputed, unless otherwise indicated.

1

December of 2002, and a Master of Arts degree in Marriage and Family Therapy from Oral Roberts University in May of 2003. He earned a Doctor of Psychology degree in Clinical Psychology from Regent University in May of 2009.

2. From August of 2006 until June of 2007, Dr. Braun worked at several different locations as a clinical practice student (supervised practical application for student clinicians), providing counseling services including clinical assessments of individuals concerning risk of suicide and other emotional difficulties. He completed a Pre-Doctoral Internship at Kaiser Permanente, Fresno, from August of 2008 to August of 2009, in which he provided individual therapy, family and couples therapy, and conducted psychological evaluations. He has worked as an In-Home Counsel from January of 2005 until June of 2008, providing comprehensive therapy services for individuals and families. From September of 2009 until August of 2017, he worked as a Clinical Psychologist at both Wasco State Prison and High Desert State Prison ("HDSP"), providing comprehensive services to individuals who are chronically mentally ill and/or are acutely in crisis. These services included working with individuals who were suicidal, homicidal, and/or gravely disabled.

3. Dr. Braun evaluated plaintiff for psychological complaints on January 3, 2012, and provided plaintiff counseling, and scheduled him for psychiatry ASAP, according to his notes. (ECF No. 49 at 3, 22.)

4. On January 3, 2012, Plaintiff complained to Dr. Braun that he was feeling depressed.

5. Plaintiff admits that on January 3, 2012, he told Dr. Braun that he tried to choke himself out a couple of days earlier, as plaintiff testified in his deposition, but denied any suicidal ideation in the presence of Dr. Braun.[2]

6. On January 3, 2012, in Dr. Braun's medical opinion, plaintiff needed to see a psychiatrist to reinstate his prior antidepressant medication.

---

[2] In his verified pleading, plaintiff states that he let Dr. Braun know that plaintiff "had tried to choke [himself] out a *few weeks* ago." (ECF No. 10 at 3 (emphasis added).) This comports with Dr. Braun's medical progress notes stating that plaintiff "reportedly tried to 'choke himself out' a *few weeks* ago." (ECF No. 43-4 at 6 (emphasis added).) Dr. Braun also charted that plaintiff denied the choking incident was a suicide attempt. (Id.)

2

7. Dr. Braun could not prescribe plaintiff's antidepressant medication.

8. On January 3, 2012, Dr. Braun referred plaintiff to a psychiatrist by including the referral in his visit notes, and by contacting the scheduler at the prison to request that plaintiff be seen by a psychiatrist.[3]

9. The policy of the California Department of Corrections and Rehabilitation ("CDCR") in the early-2012 time frame was to follow-up with patients every ninety days.

10. Given plaintiff's complaints of depression, Dr. Braun made the medical decision to follow-up with him every thirty days.

11. Dr. Braun saw plaintiff on January 30, 2012, at which time plaintiff complained that he had not seen a psychiatrist since their previous visit, and he told Dr. Braun that he was still feeling depressed.

12. On January 30, 2012, Dr. Braun again made a referral for plaintiff to see a psychiatrist ASAP by both including it in his visit notes and contacting the scheduler after the visit to specifically request the referral.

13. Dr. Braun saw plaintiff again on February 21, 2012. At that visit, plaintiff claimed that he still had ongoing depression, but had not seen a psychiatrist.

14. Dr. Braun was frustrated that despite his attempts to get plaintiff an appointment with a psychiatrist, plaintiff had not received the appointment.

15. On February 21, 2012, Dr. Braun referred plaintiff to a psychiatrist by including the ASAP referral in his notes, and contacting the scheduler.

16. On February 27, 2012, plaintiff was seen by one of the prison's contract psychiatrists, Dr. Majumdar.

17. Dr. Braun had no control over the referrals to psychiatry.[4]

---

[3] Plaintiff argues that there was no evidence to support Dr. Braun's claim that the doctor contacted the scheduler to request plaintiff be seen by a psychiatrist. However, Dr. Braun's declaration attesting to such contact, personally made by Dr. Braun, is evidence of such contact. Fed. R. Civ. P. 56(c)(4).

[4] Dr. Braun also declares that he had no influence over the referrals to psychiatry, and that as a clinical psychologist, all he could do was make the referral and follow-up with the patient to

3

18. Whether the referral was processed was up to the scheduler, over whom Dr. Braun had no control.[5]

19. The contract psychiatrists were not CDCR employees and typically worked only on weekends.

20. The contract psychiatrists would see 40-50 patients per day, and there were generally far more than 100 patients per weekend who needed treatment.

21. Dr. Braun does not know why plaintiff was unable to see a psychiatrist until February 27, even though Dr. Braun made three referrals for him to see one.[6]

22. The prison had a Mental Health Crisis Bed ("MHCB") located within the Correctional Treatment Center ("CTC").

23. The standard for an involuntary commitment to the MHCB is whether the patient poses a danger to himself and/or others, or has a grave disability. The standard is the same as that contained within the Lanterman-Petris-Short Act (Cal. Welf. & Inst. Code § 5150.)

24. Dr. Braun could not commit a patient to the MHCB without probable cause, and determining probable cause for this purpose is discretionary.[7] (ECF No. 43-4 at 3.)

////

////

---

counsel him about his mental health issues. Plaintiff argues that under the Eighth Amendment, the doctor was required to take additional steps to ensure that plaintiff was seen by a psychiatrist as soon as possible to prescribe plaintiff's antidepressant medications, to prevent a possible suicide attempt, based on plaintiff's prior suicide attempts.

[5] Dr. Braun declares that as a clinical psychologist, Dr. Braun was at the mercy of the scheduler and the contract psychiatrist. Plaintiff denies the doctor was at their mercy, and declares that the doctor could have contacted the scheduler's supervisor or superior staff. Dr. Braun disputes plaintiff's claim as a mere opinion, objecting that plaintiff provided no foundation for such opinion. (ECF No. 51 at 8.)

[6] Plaintiff disputes this statement, arguing there was ample evidence that Dr. Braun was aware plaintiff complained of not having his medications for about two months, and had not seen a psychiatrist despite Dr. Braun's three requests for referral to a psychiatrist. But the evidence plaintiff cites does not explain why the delay occurred.

[7] Plaintiff objects to this statement, but provided no basis or expert opinion for such objection. Dr. Braun's evidence for such fact is his declaration based on his expertise as a medical provider.

25. Based on his clinical experience and medical training, Dr. Braun's medical opinion was that plaintiff did not pose a danger to himself between January 3, 2012, and February 27, 2012, nor was he gravely disabled to justify an involuntary commitment.[8]

26. Dr. Braun had no involvement in creating the CDCR's mental health policies at HDSP.

27. Dr. Braun declares he had no choice but to adhere to CDCR's policies and procedures. (ECF No. 43-5 at 3.) Plaintiff denies this statement because Dr. Braun concedes he chose to follow-up with plaintiff every 30 days even though the policy was to follow-up every 90 days. (ECF No. 49 at 10.) Defendants did not reply to plaintiff's response.[9] (ECF No. 51 at 11, 20.)

28. [This is intentionally left blank.][10]

29. Dr. Braun gave plaintiff all of the treatment that he deemed was medically necessary for plaintiff's depression.[11] (ECF No. 43-4 at 3.)

30. Dr. Majumdar earned a Bachelor of Arts degree from Oberlin College in 2002. He earned a Doctor of Medicine degree from Ross University School of Medicine in 2006.

---

[8] Plaintiff denies this statement on the grounds that the instant claims are not based on plaintiff wanting to be committed to a MHCB. Rather, plaintiff alleges that Dr. Braun failed to expedite plaintiff's referral to the psychiatrist, resulting in a harmful two month delay in prescribing antidepressant medication. Defendants did not reply to plaintiff's response in their reply to undisputed statement of facts. (ECF No. 51 at 10.) Nevertheless, plaintiff provided no expert medical opinion rebutting Dr. Braun's medical opinion.

[9] Indeed, in their reply to plaintiff's response to defendants' statements of undisputed facts, defendants left multiple reply spaces blank. (ECF No. 51 at 10-12 (UDF 25, 27-29); 13-15 (UDF 37-40; 42, 43); 16 (UDF 47); 17-18 (UDF 49-50); 18 (UDF 51); 19-24 (Pl.'s Disputed Facts 2-15).)

[10] Whether or not Dr. Braun was deliberately indifferent is not a disputed or undisputed fact; rather, it is the legal question at issue.

[11] Plaintiff denies this statement because despite the allegation that plaintiff requested medication at every encounter with Dr. Braun, and despite allegedly knowing plaintiff's history of prior suicide attempts, Dr. Braun failed to take additional steps to ensure plaintiff received his antidepressant medication as soon as possible in order to prevent a suicide attempt. Defendants counter that Dr. Braun did everything within his power to ensure plaintiff received appropriate medical care. (ECF No. 50 at 2.)

31. Dr. Majumdar is board certified in Psychiatry and Neurology, as well as Addiction Medicine.

32. Dr. Majumdar is licensed to practice medicine in California and Michigan.

33. Dr. Majumdar has significant clinical experience dealing with patients who exhibit suicidal ideation and depression, and has been trained to recognize the symptoms of someone who poses a risk to himself and/or others.

34. Dr. Majumdar treated plaintiff on February 27, 2012, at which time plaintiff complained of feeling depressed.

35. Plaintiff told Dr. Majumdar that he had trouble with sleep and appetite, but denied any suicidality, homicidality, or psychotic symptoms. Plaintiff admits this statement, but contends it is incomplete. Dr. Majumdar's medical record confirms that plaintiff also told Dr. Majumdar: "I haven't taken my medication for about 3 months and I feel really, really bad. I want to go back to my old dosage. I feel really depressed." (ECF No. 43-5 at 8.)

36. In Dr. Majumdar's medical opinion, plaintiff's depression could be alleviated by restarting his prior prescription for Mirtazapine 30 mg, which is a common antidepressant.

37. In the time frame of the incidents alleged in plaintiff's lawsuit, contract psychiatrists did not see referral notices unless they were attached to the patient's chart on the day of the scheduled visit.[12] (ECF No. 43-5 at 2.)

38. Dr. Majumdar did not receive any referral information prior to the date of the scheduled visit, so he had no way of knowing when a patient was referred to his care. (Id.)

39. As a contractor, Dr. Majumdar simply came in and saw whomever was scheduled for him that day. (Id.)

40. Dr. Majumdar did not intentionally or deliberately avoid treating plaintiff, and he did not contribute to the delay in plaintiff's medical visit with Dr. Majumdar. (Id.)

41. Mirtazapine 30 mg is a standard antidepressant.

////

---

[12] Plaintiff disputes this fact, claiming lack of evidence and foundation. But as with Dr. Braun, Dr. Majumdar's declaration is the supporting evidence for this fact.

42. The medical community recognizes that doctors do not know if an antidepressant will be effective for someone until the patient has been on a sufficient dose for at least eight weeks. This is because the immediate effect an antidepressant has, such as raising serotonin levels, leads to downstream effects that treat the symptoms, such as reducing stress hormones or their effects.[13] (ECF No. 43-5 at 2.)

43. Some patients may see benefits sooner, but for others it might have no noticeable benefit before eight weeks of consistent dosing and then suddenly feel relief after eight weeks. (Id.)

44. HDSP had a MHCB located within the CTC.

45. The standard for an involuntary commitment to the MHCB is whether the patient poses a danger to himself and/or others, or has a grave disability. The standard is the same as that contained within the Lanterman-Petris-Short Act (Cal. Welf. & Inst. Code § 5150.)

46. Dr. Majumdar could not commit a patient to the MHCB without probable cause, and determining probable cause for this purpose is discretionary.

47. Based on Dr. Majumdar's clinical experience and medical training, his medical opinion was that plaintiff did not pose a danger to himself on February 27, 2012, and plaintiff was not gravely disabled to justify an involuntary commitment. (ECF No. 43-5 at 2.)

48. Dr. Majumdar had no involvement in creating the CDCR's mental health policies at HDSP.

49. Dr. Majumdar had no choice but to adhere to CDCR's policies and procedures. (ECF No. 43-5 at 3.)

50. [This is intentionally left blank.][14]

51. Dr. Majumdar declares that he gave plaintiff all of the treatment that he deemed was medically necessary for his depression. (ECF No. 43-5 at 3.)

---

[13] Plaintiff objects on the grounds that Dr. Majumdar did not offer this statement as his expert opinion. However, as a psychiatrist, Dr. Majumdar is qualified to make this statement, and plaintiff offers no expert medical opinion in rebuttal.

[14] Whether or not Dr. Majumdar was deliberately indifferent is not a disputed or undisputed fact; rather, it is the legal question at issue.

7

52. On February 29, 2012, plaintiff was committed to a MHCB at HDSP following his suicide attempt. (ECF No. 10 at 8.)

III. <u>Summary Judgment Standards</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Under summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact." <u>In re Oracle Corp. Sec. Litig.</u>, 627 F.3d 376, 387 (9th Cir. 2010) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case." <u>Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325.); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See <u>Celotex</u>, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Id.</u> In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment . . . is satisfied." <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). In attempting to establish the

existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(c)(1); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (citations omitted).

"In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all reasonable inferences supported by the evidence in favor of the non-moving party." Walls v. Central Costa County Transit Auth., 653 F.3d 963, 966 (9th Cir. 2011). It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

By contemporaneous notice provided on September 14, 2017 (ECF No. 43-1), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal
////

Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

IV. Legal Standards

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of [state law] . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The statute requires that there be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by plaintiff. See Monell v. Department of Social Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976). "A person 'subjects' another to the deprivation of a constitutional right, within the meaning of § 1983, if he does an affirmative act, participates in another's affirmative acts or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made." Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978).

"The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006), citing Farmer v. Brennan, 511 U.S. 825, 832 (1994). In order to prevail on a claim of cruel and unusual punishment, a prisoner must allege and prove that objectively he suffered a sufficiently serious deprivation and that subjectively prison officials acted with deliberate indifference in allowing or causing the deprivation to occur. Wilson v. Seiter, 501 U.S. 294, 298-99 (1991).

To prevail on an Eighth Amendment claim predicated on the denial of medical care, a plaintiff must show that: (1) he had a serious medical need; and (2) the defendant's response to the need was deliberately indifferent. Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976). To establish a serious medical need, the plaintiff must show that the "failure to treat [the] . . . condition could result in further significant injury or the unnecessary and wanton infliction of pain." Jett, 439 F.3d at 1096 (citation omitted). "The existence of an injury that a reasonable doctor or patient would find important and worthy

10

of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment." McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).

For a prison official's response to a serious medical need to be deliberately indifferent, the official must "'know[ ] of and disregard[ ] an excessive risk to inmate health.'" Peralta v. Dillard, 744 F.3d 1076, 1082 (9th Cir. 2014) (en banc) (quoting Farmer, 511 U.S. at 837). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837.

Deliberate indifference is shown by "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need, and (b) harm caused by the indifference." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett, 439 F.3d at 1096). The requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of due care. Wilhelm, 680 F.3d at 1122.

A difference of opinion between a physician and the prisoner, or between medical professionals, regarding what medical care is appropriate does not constitute deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989); Wilhelm, 680 F.3d at 1122-23 (citing Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986). Rather, plaintiff is required to demonstrate that the course of treatment the medical professional chose was medically unacceptable under the circumstances, and that the medical professional chose such course in conscious disregard of an excessive risk to plaintiff's health. Jackson, 90 F.3d at 332. Deliberate indifference may be found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for] medical treatment." Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).

In order to prevail on a claim involving defendants' choices between alternative courses of treatment, a prisoner must show that the chosen treatment "was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to plaintiff's health." Jackson, 90 F.3d at 332. In other words, so long as a defendant decides on a medically acceptable

course of treatment, his actions will not be considered deliberately indifferent even if an alternative course of treatment was available. Id.

V. Discussion

### A. Serious Medical Need

The parties do not dispute, and the undersigned finds, that based upon the evidence presented by the parties in connection with the pending motion, a reasonable juror could conclude that plaintiff's mental health issues constitute an objective, serious medical need. See McGuckin, 974 F.2d at 1059-60 ("The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a 'serious' need for medical treatment.").

### B. Deliberate Indifference

#### i. Dr. Braun

##### a. Subjective Standard

Plaintiff concedes that he did not tell Dr. Braun that plaintiff was experiencing suicidal thoughts during meetings with Dr. Braun. Dr. Braun opined that during the relevant time frame, plaintiff did not pose a danger to himself, and plaintiff was not gravely disabled to justify an involuntary commitment. Plaintiff argues that because he had been suicidal in the past, Dr. Braun should have known that plaintiff was at risk for another suicide attempt. However, the only evidence plaintiff provided of a prior suicide attempt was when he was an inmate in the Santa Clara Main Jail, perhaps in 2008 or 2009. (ECF No. 49 at 22, 33.) Plaintiff fails to demonstrate that either Dr. Braun or Dr. Majumdar were aware of such attempt. Aside from Dr. Braun charting plaintiff reportedly tried to choke himself out (UDF 5), plaintiff submitted no other evidence of prior attempted suicides while plaintiff was incarcerated in state prison, or that such evidence was included in his mental health records.

Moreover, as other courts have concluded, just because plaintiff has attempted suicide in the past does not mean that Dr. Braun was deliberately indifferent by meeting with plaintiff for therapeutic contact, providing counseling, and determining that plaintiff was not actively suicidal.

See Bremer v. County of Contra Costa, 2016 WL 6822011, at *9 (N.D. Cal. Nov. 18, 2016) (explaining that "knowing that someone had been placed on suicide watch -- even the highest level -- is insufficient to put an officer on notice that the person is in imminent danger of harming themselves," and granting summary judgment in defendants' favor, citing Simmons v. Navajo Cty., Ariz., 609 F.3d 1011, 1018 (9th Cir. 2010).).

Accordingly, the undersigned finds that plaintiff has failed to adduce evidence that Dr. Braun was subjectively aware that plaintiff was at substantial risk of harm or imminent suicide.

b. Objective Standard

As to the objective standard, plaintiff adduced no evidence to rebut Dr. Braun's declaration, such as a declaration from the scheduler denying such contact occurred. Rather, plaintiff claims that Dr. Braun did not tell plaintiff that the doctor had contacted the scheduler. But such failure does not demonstrate that each contact was not made. Plaintiff further contends that Dr. Braun should have taken additional steps. For example, plaintiff claims Dr. Braun could have contacted his "superior staff" to check what was going on with the delay in providing plaintiff his antidepressant medication. (ECF No. 49 at 23.) But plaintiff provided no other evidence to support his claim that Dr. Braun had additional options to ensure that plaintiff was timely seen by a psychiatrist. Plaintiff's speculation as to such options, without evidentiary support, is insufficient to rebut Dr. Braun's declaration to the contrary.

Further, Dr. Braun charted on January 3, 2012, that plaintiff should see a psychiatrist ASAP, and noted plaintiff's GAF score was 61.[15] (ECF No. 43-4 at 6.) By January 30, 2012, 27

---

[15] "GAF" is an acronym for "Global Assessment of Functioning," a scale used by clinicians to assess an individual's overall level of functioning, including the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders with Text Revisions 32 (4th ed. 2004) ("DSM IV-TR"). A GAF of 61-70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school function (e.g, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships. Id. A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers.) Id. A 41-50 rating indicates serious symptoms such as suicidal ideation, severe obsessional rituals, or serious impairment in social, work, or school functioning. A GAF of 31-40 indicates: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to

13

days later, plaintiff still had not seen a psychiatrist. Dr. Braun assessed plaintiff's GAF score was 60, and again marked the referral ASAP. (Id. at 7.) By February 21, 2012, 49 days after Dr. Braun first asked for an ASAP psychiatrist referral, Dr. Braun assessed plaintiff's GAF score as 59, and charted that plaintiff reported he was staying in his cell more, having less social interactions, and having some difficulties not lashing out at others. (Id. at 8.) Dr. Majumdar declared that the medical community is aware that antidepressant medication can take up to eight weeks to be effective. Thus, a jury could infer that Dr. Braun sought an ASAP psychiatrist referral because it takes time for antidepressant medication to become effective. Plaintiff's GAF score of 59 fell in the moderate symptoms range, and Dr. Braun observed that plaintiff had "mild depression" on February 21, 2012. (ECF No. 43-4 at 8.)

"[T]he objective standard [for deliberate indifference] does not require a defendant to take *all* available measures to abate a plaintiff's risk of suffering serious harm." Bremer, 2016 WL 6822011 at *9. Here, it is undisputed that Dr. Braun could not prescribe medication, and met with plaintiff three times in 49 days, despite CDCR policy that patient follow-up was to occur every 90 days. Dr. Braun provided plaintiff counseling on three different occasions: 45 minutes on January 3, 2012 (ECF No. 49 at 36); 30 minutes on January 30, 2012 (ECF No. 49 at 45), and 45 minutes on February 21, 2012 (ECF No. 49 at 47). After each appointment, in addition to charting that plaintiff needed to be seen by a psychiatrist ASAP, Dr. Braun contacted the scheduler at the prison to request that plaintiff be seen by a psychiatrist. Such evidence demonstrates that Dr. Braun took additional steps, beyond standard practice, to ensure plaintiff received treatment for his mental health issues, and does not demonstrate deliberate indifference.

Plaintiff did not receive antidepressant medication for at least 57 days. But plaintiff adduces no evidence demonstrating that the delay was caused by Dr. Braun. Rather it appears that the delay may have been negligence on the part of prison staff because plaintiff was repeatedly referred for psychiatric evaluation ASAP. Plaintiff may have a claim in state court for

---

work; child frequently beats up younger children, is defiant at home, and is failing at school.)" Id. A GAF of 21-30 indicates: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Id.

14

negligence or medical malpractice, but on this record, plaintiff fails to demonstrate that Dr. Braun failed to take reasonable measures to abate any risk of serious harm to plaintiff.

### ii. Dr. Majumdar

#### a. Delay

Dr. Majumdar declared that during early 2012, contract psychiatrists did not see referral notices unless they were appended to the prisoner's chart on the day of the scheduled appointment, and Dr. Majumdar did not receive any referral information before such appointment. Rather, as a contractor, Dr. Majumdar reported to the prison and saw the prisoners scheduled for him that day. Plaintiff did not provide any evidence contradicting such practice for contract psychiatrists. Because Dr. Majumdar did not see plaintiff until February 27, 2012, he was not aware of Dr. Braun's referral slips, plaintiff's depression, or plaintiff's need for medication until February 27, 2012. Plaintiff adduced no evidence demonstrating that Dr. Majumdar was sent Dr. Braun's referral slips, or that Dr. Majumdar knew plaintiff was depressed or needed medication before February 27, 2012. Because plaintiff failed to demonstrate that Dr. Majumdar was aware that plaintiff was depressed and needed medication prior to February 27, 2012, Dr. Majumdar cannot be responsible for the alleged delay in receiving medication or a mental health evaluation by a psychiatrist prior to February 27, 2012.

Plaintiff also argues that Dr. Majumdar's stern warning about the consequences of failing to take the medications as prescribed suggests that the doctor intentionally delayed plaintiff's treatment because plaintiff had refused his medication three times in the past. (ECF No. 14, citing No. 49 at 26.) But because such warnings are commonly given patients, plaintiff's statement is insufficient to raise such an inference absent any other evidence connecting the doctor's warning to plaintiff's prior noncompliance. Plaintiff did not submit medical evidence of such alleged noncompliance or any evidence of prior medication or mental health treatment history in support of his opposition.

Further, plaintiff argues that Dr. Majumdar should have expedited plaintiff's receipt of the medication. Dr. Majumdar's progress note states "restart Mirtazapine," but there are no pharmaceutical records confirming when the prescription was written or dispensed to plaintiff.

15

Plaintiff declares that on February 29, 2012, he "was tired of . . . waiting for [his] antidepressant medications" (ECF No. 49 at 27), suggesting he had not yet received the medication at the time of his suicide attempt. But even if Dr. Majumdar had expedited receipt of plaintiff's medication such that plaintiff received it on February 27, 2012, it would not have been effective by February 29, 2012. (UDF 42.) Even plaintiff declares that based on his prior experience with this antidepressant, if he had received the antidepressant at least one week earlier it was reasonably probable the suicide attempt on February 29 would not have occurred. (ECF No. 49 at 28.) Less than two days had elapsed between plaintiff's visit with Dr. Majumdar and plaintiff's suicide attempt; thus, it is not likely that the medication would have been effective by February 29, 2012.

### b. Failure to Refer

Plaintiff claims that the doctor should have referred plaintiff for a mental health evaluation. (ECF No. 49 at 88.) However, Dr. Majumdar is a psychiatrist who determined that, in his expert medical opinion, plaintiff did not pose a danger to himself on February 27, 2012, so there was no need for him to refer plaintiff for any further evaluation, and the doctor found no probable cause to admit plaintiff to an MHCB at that time. Plaintiff did not provide his own medical expert opinion in rebuttal.

To the extent plaintiff argues that Dr. Majumdar failed to take sufficient steps on February 27, 2012, plaintiff's difference of opinion with Dr. Majumdar about the proper course of treatment does not rise to the level of a federal civil rights violation. See Cano v. Taylor, 739 F.3d 1214, 1217 (9th Cir. 2014) (a difference of opinion as to medical treatment "is not actionable"); Toguchi v. Chung, 391 F.3d 1051, 1058-60 (9th Cir. 2004). Plaintiff's disagreement with Dr. Majumdar about the type of mental health treatment he required does not reflect a conscious disregard of plaintiff's serious medical needs. Indeed, Dr. Majumdar prescribed plaintiff the medication he requested. Dr. Majumdar's failure to refer plaintiff for an additional mental health evaluation or to take any additional steps does not rise to the level of deliberate indifference in violation of the Eighth Amendment. See McGuckin, 974 F.2d 1050 (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.").

c. <u>Failure to Diagnose</u>

Plaintiff concedes he did not tell Dr. Majumdar that plaintiff was suicidal. Plaintiff now declares that he tried to choke himself out with a towel on February 26, 2012. (ECF No. 49 at 26.) But plaintiff does not declare that he told Dr. Majumdar about this incident on February 27, 2012. Plaintiff now declares that "in his mind" he "had a plan to hurt [him]self with the bed sheet for about 3 weeks for the lack of medication." (ECF No. 49 at 25.) But, again, he did not tell Dr. Majumdar about such plan. Indeed, plaintiff's denial of any suicidal ideation when he met with Dr. Majumdar on February 27, 2012, is confirmed by the doctor's medical progress note. Moreover, plaintiff declares it was not until he returned to his cell that his mind was racing and when lying in his bunk he again attempted to choke himself out with a towel. (ECF No. 49 at 25.) But plaintiff points to no evidence demonstrating that Dr. Majumdar was subjectively aware or knew that plaintiff developed suicidal ideation after plaintiff's appointment ended on February 27, 2012. Plaintiff provides no evidence showing that he reached out to any prison staff or Dr. Braun following his efforts to choke himself out with a towel on February 26, 27 or 28, 2012, or to report his suicidal thoughts.

Moreover, the February 27, 2012 medical progress note reflects that Dr. Majumdar evaluated plaintiff for 25 minutes, and assessed plaintiff as Adjustment Disorder with Depressed Mood vs. Major Depressive Disorder (Single Episode, Mild). (ECF No. 43-5 at 8.) Plaintiff identified multiple stressors, including a denied appeal and family problems. Dr. Majumdar charted that plaintiff "noted that he has trouble with sleep and appetite, but gave mixed and at times conflicting statements about sleeping and eating too much or too little." (ECF No. 43-5 at 8; 49 at 25.) Plaintiff denied any current suicidality. (<u>Id.</u>) Dr. Majumdar also charted his observation that plaintiff "described his current mood as 'bad,' but appeared incongruently euthymic with a full, smiling affect." (ECF No. 43-5 at 8.) Dr. Majumdar declared that in his expert opinion, plaintiff did not pose a danger to himself on February 27, 2012.

Therefore on this record, plaintiff's argument that Dr. Majumdar failed to diagnose plaintiff's suicidal ideation on February 27, 2012, would at most constitute negligence or medical malpractice, which is insufficient to demonstrate an Eighth Amendment violation. The Eighth

Amendment standard is a high one -- plaintiff must show more than "negligence" or "medical malpractice." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980). "Even gross negligence is insufficient to establish deliberate indifference to serious medical needs." Lemire v. CDCR, 726 F.3d 1062, 1081-82 (9th Cir. 2013) (internal citations omitted). Based on the evidence adduced herein, Dr. Majumdar's actions do not demonstrate deliberate indifference under the Eighth Amendment.

VI. Qualified Immunity

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) quoting Reichle v. Howards, 566 U.S. 658, 664 (2012). Qualified immunity analysis requires two prongs of inquiry: "(1) whether 'the facts alleged show the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly established' as of the date of the involved events 'in light of the specific context of the case.'" Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) quoting Robinson v. York, 566 F.3d 817, 821 (9th Cir. 2009). These prongs need not be addressed in any particular order. Pearson v. Callahan, 555 U.S. 223 (2009).

If a court decides that plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." Saucier v. Katz, 533 U.S. 194, 201 (2001).

Here, the court finds that plaintiff has not established a violation of his Eighth Amendment rights. Accordingly, there is no need to address qualified immunity.

VII. Conclusion

Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court is directed to assign a district judge to this case; and

IT IS RECOMMENDED that defendants' motion for summary judgment (ECF No. 43) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days

after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: July 18, 2018

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

/gome2523.msj.med.mh